J-S42023-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHRISTOPHER LAWRENCE PETERMAN | |
| Appellant | No. 1412 WDA 2015 |

Appeal from the Judgment of Sentence March 19, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000600-2013

BEFORE:  SHOGAN, J., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:               **FILED SEPTEMBER 08, 2016**

Christopher Lawrence Peterman brings this appeal from the judgment of sentence imposed on March 19, 2015, in the Court of Common Pleas of Westmoreland County. Peterman was convicted by a jury of aggravated assault, criminal conspiracy to commit aggravated assault and endangering the welfare of children, and endangering the welfare of children.[1]  The trial court sentenced Peterman to serve an aggregate term of nine to 18 years' imprisonment.  The victim is the infant daughter of Peterman and his co-defendant, Elizabeth Mae Fair.[2]  Peterman raises eleven issues in his brief,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 2702(a)(1), 903(a)(1) and 4303(a)(1), respectively.

[2] Fair was tried with Peterman and convicted of conspiracy to commit aggravated assault and endangering the welfare of children, and
*(Footnote Continued Next Page)*

challenging, *inter alia*, the trial court's pre-trial rulings, evidentiary rulings, the weight and sufficiency of the evidence, and the denial of his motion for mistrial.[3] Based upon the following, we affirm.

The trial court has provided a succinct statement of the procedural history as well as an extensive discussion of the facts of this case and, therefore, we need not restate them here. **See** Trial Court Opinion, 8/17/2015, at 3–14. Briefly, the three-month old victim suffered numerous severe injuries while under the care of Peterson and Fair.[4] The injuries were discovered after Peterson and Fair brought the victim to Westmoreland Hospital on October 20, 2012. An emergency room doctor called Dr. Rachel Berger, a pediatrician and Division Chief for the Division of Child Advocacy at Children's Hospital of Pittsburgh, who was on-call for the Child Protection

*(Footnote Continued)* ———————————

endangering the welfare of children. **See** 18 Pa.C.S. §§ 903(a)(1) and 4303, respectively. Fair has filed an appeal, which is listed immediately prior to this appeal. **Commonwealth v. Fair**, 1411 WDA 2015, J-S42022-16.

[3] We note the trial court did not order Peterman to file a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). On September 17, 2015, the trial court filed a Rule 1925(a) statement, relying on its opinion filed August 17, 2015, which accompanied the order denying Peterman's post-sentence motions.

[4] On July 20, 2012, the victim was born prematurely, and was hospitalized for one and one-half months after her birth. Peterman and Fair learned how to perform CPR and use the oxygen and monitor the victim required. On September 24, 2012, the victim was discharged from the hospital with a pulse oximeter, which kept track of her oxygen levels, and an A&B monitor, which kept track of her heart rate and breaths. **See** Trial Court Opinion, 8/17/2015, at 3 n.1.

Team, for consultation regarding child abuse concerns. The charges against Peterman arose following an investigation by state police upon receiving a report from Westmoreland County Children's Bureau regarding suspected child abuse by Peterman and Fair.

The first issue raised by Peterson is a challenge to the trial court's denial of his pre-trial motion for severance. **See** Peterson's Brief at 1.

In reviewing this claim, our standard of review is well established:

> The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court, reversal of which is proper only in the event of an abuse of that discretion. **Commonwealth v. Chester**, 526 Pa. 578, 587 A.2d 1367, 1373, *cert. denied*, 502 U.S. 959, 116 L. Ed. 2d 442, 112 S. Ct. 422 (1991). While joint trials are preferred in those cases in which conspiracy is charged and the evidence against one actor is the same or similar to that presented against the other actor, the law is also clear that severance is required whenever codefendants intend to present antagonistic defenses. **Id.** However, "the mere fact that there is hostility between the defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials." **Id.** **See also** Pa.R.Crim.P. 583 (severance may be ordered if prejudice established).

**Commonwealth v. Hetzel**, 822 A.2d 747, 763 (Pa. Super. 2003).

Here, prior to trial the Honorable John E. Blahovec denied Peterson's motion to sever, stating:

> Where, as here, the crimes charged grow out of the same acts and much of the same evidence is necessary or applicable to all defendants, joint rather than separate trials are to be preferred. **Commonwealth v. Chester**, 587 A.2d 1367 (Pa. 1991); **Commonwealth v. Childress**, 680 A.2d 1184 (Pa. Super. 1996). Moreover, more than a bare assertion of antagonistic defenses is required to justify severance. The mere fact that there is hostility between the defendants, or that one may try to

save himself at the expense of another, is in itself not sufficient grounds to require separate trials. In fact it has been held that the fact that "defendants have conflicting versions of what took place, or the extents to which they participated in its, is a reason for rather than against a joint trial because the truth may be more easily determined if they are all tried together. *See Commonwealth v. Chester*, at 1373.

Trial Court Opinion, 7/23/2013, at 1–2.

Peterman asserts "a real prejudice existed at trial and was not mere speculation since the jury found him guilty and Fair not guilty of aggravated assault on the same evidence." Peterman's Brief, at 2. Peterman asserts the jury based the verdict on the identical evidence that did not identify who committed the assaults. *Id.* He states that Fair testified on her own behalf and he chose not to testify since he had *crimen falsi* convictions. *Id.* In support of his argument, Peterman cites *Commonwealth v. Patterson,* 546 A.2d 596 (Pa. 1988).

We are not persuaded by Peterman's argument and find that *Patterson* supports the trial court's ruling denying severance. In *Patterson*, the Pennsylvania Supreme Court stated, "The mere fact that a co-defendant might have a better chance of acquittal if tried separately is not sufficient to grant a motion to sever." *Id.* at 599. Based on our review, we find no abuse of discretion by the trial court's denial of the motion to sever. Accordingly, we reject Peterman's first argument.

In the second issue raised on appeal, Peterman contends the trial court abused its discretion in denying his pre-trial motion to obtain Fair's

medical records.[5]  The entire discussion of Peterman's second issue is, as follows:

> [Peterman] contends he was denied a fair trial when his pre-trial Motion to Obtain [Fair's] medical records her pertaining to post-partum depression was denied.  [Peterman] was not able to inquire about evidence regarding [Fair's] state of mind at the time of the alleged crimes.  [Peterman] contends this is real prejudice at trial and was not mere speculation since this denial impacted the evidence during a joint trial.

Peterman's Brief, at 2.

The Commonwealth has objected to this issue on the grounds that Peterman's argument "is completely unsupported by any facts or argument related to how said records were relevant and what they contained (beyond a vague averment of post partum depression) [and] no case law is cited regarding the lower court's discretion in such motions."  Commonwealth's Brief, at 23.  We fully agree with the Commonwealth's position.  Accordingly, we find waiver as to Peterman's second claim. *See* Pa.R.A.P. 2119(a); ***Commonwealth v. McMullen***, 745 A.2d 683, 689 (Pa. Super. 2000) (failure to develop argument results in waiver).

Next, Peterman claims the trial court[6] abused its discretion in admitting prejudicial hospital photographs showing "the victim attached to tubing and medical devices without displaying any visible injuries and a 3D

_____

[5] The Honorable Richard E. McCormick, Jr., denied Peterman's motion to obtain mental health records by order filed March 24, 2014.

[6] The Honorable Meagan Bilik-DeFazio presided at trial.

- 5 -

image that was not representative of the victim's injury." Peterman's Brief, at 3. Peterman asserts the photographs and image "were so highly prejudicial that any probative value was outweighed" by the prejudicial impact and their admission denied him a fair trial. *Id.*

> "The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." *Commonwealth v. Reid*, 627 Pa. 151, 99 A.3d 470, 493 (Pa. 2014). An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. *Commonwealth v. Davido*, 106 A.3d 611, 645 (Pa. 2014).

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015).

Admission of potentially inflammatory photographs is governed by the following two-step analysis:

> First, a trial court must determine whether the photographs are inflammatory. If not, they may be admitted if they have relevance and can assist the jury's understanding of the facts. If the photographs are inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008) (citation omitted). Additionally, "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." *Commonwealth v. Haney*, 131 A.3d 24, 38 (Pa. 2015) (quotations and citation omitted).

An inflammatory photograph "must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective assessment of the guilt or innocence of the defendant." ***Commonwealth v. Dotter***, 589 A.2d 726, 729 (Pa. Super. 1991) (citation and quotation omitted). Here, at issue are two photographs and one 3D image. Commonwealth Exhibits 2, 3, and 6. One photograph, Commonwealth Exhibit 2, showed the victim attached to tubing and with a collar to support her head. The second photograph, Commonwealth Exhibit 3, showed swelling in the right femur. The Commonwealth argues Peterman "erroneously asserts that the victim's injuries are not portrayed in the hospital photographs of her." Commonwealth Brief, at 25. We agree.

Having viewed the photographs, we conclude the trial court committed no abuse of discretion in admitting these photographs and 3D image, which we find to be non-inflammatory and relevant to show the nature and extent of the victim's injuries. Even accepting, *arguendo*, Peterman's argument that the photographs are inflammatory, we would find this issue meritless since the photographs were highly probative as they related to the element of serious bodily injury. ***See*** 18 Pa.C.S. § 2702(a)(1). As to Peterman's argument that the 3D image was not representative of the fracture because "Dr. Berger testified the image reflects the victim had a fracture on the left side of her skull while all medical reports indicate the fracture was on the right side of the temporal skull," Dr. Berger explained the image was simply "a different view of the same 3D [imaging technology]," and the image was

- 7 -

not flipped." N.T., 12/1-5/2014, at 235, 238. Accordingly, we find no abuse of discretion and, therefore, reject Peterman's third claim.

In his fourth issue, Peterman contends the trial court abused its discretion in precluding Peterman's cross-examination of Brandy Trout regarding Fair's post partum depression. Peterman argues he attempted to have Trout, an assessment caseworker with the Westmoreland County Children's Bureau, testify that she received information that Fair may have post partum depression. Peterman's Brief at 4. *See* N.T., 12/1-5/2014, at 181. The Commonwealth interposed an objection and, following a sidebar conference, the trial court found that the question called for speculation, and ordered that the question be stricken and instructed the jury to disregard it. *See* N.T., 12/1-5/2014, at 184–185.

As we have already stated, the admission of evidence is within the discretion of the trial court. *See Woodard, supra*. Here, Peterman attempted to question Trout regarding an anonymous phone call that provided information that Fair may have been suffering from post partum depression. *See* N.T., 12/1-5/2014, at 184. Such testimony would have been hearsay. Furthermore, as the trial court noted, since there was no expert testimony to explain post partum depression, the proffered testimony "would only call for speculation." *Id.* We find no abuse of discretion in the trial court's ruling. Accordingly, no relief is due on this issue.

In his fifth issue, Peterman contends the trial court abused its discretion in permitting the testimony of Trooper David Leonard regarding

statements made by Peterman to Fair "as an exception to hearsay in furtherance of a conspiracy." Peterman's Brief, at 5. Specifically, Trooper Leonard testified concerning his interview with Fair, and her statements relating what Peterman said to her about the purported collapse of the bassinet. We conclude this testimony was permissible hearsay.

Pennsylvania Rule of Evidence makes hearsay within hearsay permissible if each part of the combined statements falls within an exception to the hearsay rule. *See* Pa.R.E. 805. Fair's statements to Trooper Leonard are admissible as an admission by a party opponent under P.R.E. 803(25)(A).[7] Peterman's statements to Fair are admissible under the co-conspirator exception to the hearsay rule, Pa.R.E. 803(25)(E). The

_____

[7] Pennsylvania Rule of Evidence 803(25) provides, in pertinent part:

(25) An Opposing Party's Statement. The statement is offered against an opposing party and:

(A) Was made by the party in an individual or representative capacity;

…

(E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement may be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Pa.R.E. 803(25)(A), (E).

conspiracy here involved endangering the welfare of the child through a course of conduct that involved failing to seek medical treatment. In this regard, the testimony at issue involved Peterman's explanation to Fair of the bassinet collapse and their mutual satisfaction that the victim appeared fine and they needed to do nothing further. N.T., 12/1-5/2014, at 421.[8] We find no abuse of discretion in the trial court's ruling. Therefore, this issue fails to warrant relief.

Next, Peterman claims the trial court abused its discretion in allowing the display of the victim's bassinet to the jury. Peterman asserts "neither defendant said it was the cause" of the victim's injuries. **See** Peterman's Brief, at 6.

As already stated, the applicable standard of review governing the admission of evidence is abuse of discretion. During the trial, Dr. Berger testified "I always ask families specific questions; can you think of any other trauma, what about this injury. So, that's what I did, I asked them. [Peterman] at one point brought up the issue of the bassinet falling." N.T., 12/1-5/2014, at 206. Dr. Berger further testified that Peterman brought the bassinet to show her. **See id.** at 207–208.

_____

[8] This testimony contrasted with earlier witnesses' testimony that, at the hospital on October 20, 2012, both Peterman and Fair mentioned the unconfirmed October 17, 2012, bassinet collapse as a possible source of trauma. **Id**. at 345, 392.

We find no abuse of discretion in the trial court's ruling that the bassinet could be displayed to the jury to assist them in determining "whether or not [the bassinet] could have caused the injuries." *Id.* at 513. Furthermore, Peterman fails to present any support for his argument that the evidence was prejudicial and exceeded any probative value, thereby denying him a fair trial. *See* Peterman's Brief, at 6. In any event, we would reject such arguments as meritless in light of the issue before the jury concerning the cause of the victim's injuries. Therefore, this issue warrants no relief.

In his seventh issue, Peterman asserts the trial court abused its discretion in "not allowing [Peterman] to cross examine [Fair] on prior bad acts." Peterman's Brief, at 6. Peterman merely states that due to this denial he "was not able to zealously defend his case which denied him a fair trial." *Id.* at 7. Peterman does not identify what bad acts by Fair he sought to introduce, where in the record he proffered the bad acts evidence, where the trial court made its ruling, or where an objection preserved the issue for review. *See* Pa.R.A.P. 2119(c) ("Reference to the record"), 2119(e) ("Statement of place of raising or preservation of issues"); *see also Commonwealth v. Williams*, 980 A.2d 667, 671 (Pa. Super. 2009) (noting that under the rules of appellate procedure, an appellant must specify where in the record a claim on appeal was preserved).

We have explained that "it is not the responsibility of this Court to scour the record to prove that an appellant has raised an issue before the

- 11 -

trial court, thereby preserving it for appellate review." ***Commonwealth v. Baker***, 963 A.2d 495, 502 n.6 (Pa. Super. 2008). Accordingly, we conclude this issue is waived.

In Peterman's eighth issue, he challenges the trial court's denial of his motion for judgment of acquittal at Count 2, conspiracy to commit aggravated assault. Peterman's ninth issue is a claim that the verdicts for aggravated assault and conspiracy to commit aggravated assault were against the weight of the evidence. In his tenth issue, he challenges the sufficiency of the evidence to sustain his convictions for aggravated assault and conspiracy to commit aggravated assault.

In her opinion authored in support of the denial of post-sentence motions, the Honorable Meagan Bilik-DeFazio set forth the standards of review and relevant law, and thoroughly addressed these issues. ***See*** Trial Court Opinion, 8/17/2015, at 15–21. As our review leads us to confirm, without hesitation, that there is no basis upon which to overturn the trial court's determinations, we adopt Judge Bilik-DeFazio's opinion as dispositive of Peterman's eighth, ninth, and tenth claims.

Finally, Peterman claims the trial court abused its discretion in denying his request for a mistrial "when the jury foreperson stated the jury was hopelessly deadlocked, unable to reach a verdict and did not want to negotiate any further." Peterman's Brief, at 10.

"The amount of time a jury is kept together to deliberate is within the discretion of the trial judge, and that decision will only be reversed for

an abuse of discretion." ***Commonwealth v. Smith***, 131 A.3d 467, 475-76 (Pa. 2015). In ***Commonwealth v. Johnson***, 668 A.2d 97 (Pa. 1995), the Pennsylvania Supreme Court listed some factors to consider when determining whether the trial court abused its discretion: "the charges at issue, the complexity of the issues, the amount of testimony to consider, the length of trial, the solemnity of the proceedings and indications from the jury on the possibility of reaching a verdict." ***Id.*** at 108.

The record reflects that the jury recessed at 3:35 P.M. and reconvened at 5:38 P.M. with two questions and recessed again at 5:47 P.M. ***See*** N.T., 12/1-5/2014, at 842, 849. At 9:22 P.M. the jury returned to the courtroom and indicated in a message to the trial judge that the jury was deadlocked as to at least one charge. ***Id.*** at 849. Upon being questioned by the trial judge, the foreperson told the judge the jury did not need any additional or clarifying instructions, and there was not a reasonable possibility of the jury reaching a unanimous verdict. ***Id.*** at 851–852. The foreman also indicated to the trial judge he did not believe additional time would be helpful. ***Id.*** at 852. Thereafter, trial court instructed the jury to resume deliberations, and Peterman did not object to the court's instruction. The proceedings recessed at 9:37 P.M. and reconvened at 9:54 P.M. when the jury returned with a question. ***Id.*** at 861. The proceedings recessed at 10:00 P.M. and reconvened at 10:32 P.M., with the return of the jury's verdicts. ***Id.*** at 865.

On this record, we discern no abuse in the court's decision to request the jury to give further consideration to the evidence and charge of the

court, rather than to grant the extreme remedy of a mistrial. **See Smith, supra**, 131 A.3d at 469 ("A mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial."). At the time the jury communicated its inability to reach a unanimous decision on at least one charge, they had been deliberating for less than six hours following a jury trial that lasted from December 2, 2014 to December 5, 2014. While there were two defendants, the charges were not so complex that the jury could not reach a verdict. Accordingly, we reject Peterman's final issue.

Having reviewed the issues by Peterman, and finding them to be meritless or waived, we affirm the judgment of sentence.

Judgment of sentence affirmed.[9]

Judge Shogan joins this memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

_____

[9] In the event of further proceedings, the parties are directed to attach a copy of the trial court's opinion of August 17, 2015.

Date: 9/8/2016

IN THE SUPERIOR COURT OF PENNSYLVANIA, SITTING AT PITTSBURGH

NO. 1412 WDA 2015

COMMONWEALTH OF PENNSYLVANIA,
APPELLEE

VS.

CHRISTOPHER LAWRENCE PETERMAN,
APPELLANT

BRIEF FOR APPELLANT

APPEAL FROM THE JUDGMENT OF SENTENCE ENTERED IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA, CRIMINAL DIVISION, ON MARCH 19, 2015 AT NO. 600 CRIMINAL 2013 BY THE HONORABLE JUDGE MEAGAN BILIK-DEFAZIO.

Gregory L. Cecchetti, Esquire
Assistant Public Defender
I.D. No. 36903

2 North Main Street
Suite 404 Courthouse Square
Greensburg, PA 15601
(724) 830-3545

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . iv

ORDER IN QUESTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF SCOPE AND STANDARD OF REVIEW . . . . . v

ISSUES RAISED ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . i

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OPINION AND ORDER OF THE LOWER COURT . . . . . . . . . . . . . App. A.

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF CITATIONS

CASE:                                                                    PAGES:

Commonwealth v. Brown, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). ...........    9

Commonwealth v. Chmiel, 585 Pa. 547, 889 A.2d 501, 534 (2005) ....................    7

Commonwealth v. Clay, 619 Pa. 423, 619 A3d. 1049 (2013)...........................    v

Commonwealth v. Dolfi, 483 Pa. 266, 396 A.2d 635, 627 (1979)......................    iii, 8

Commonwealth v. Evans, 901 A.2d 528, 532 (2006). ....................................    v,9,10

Commonwealth v. Lease, 703 A.2d 506, 508 (1997)....................................    11

Commonwealth v. Morales, 508 Pa. 51, 61, 494 A.2d 367, 372 (1985)..............    1

Commonwealth v. Patterson, 519 Pa 190, 546 A2d 596, 599 (1988).................    ii, 2

Commonwealth v. Simpson, 436 Pa. 459, 260 A.2d 751 (1970)......................    8

Commonwealth v. Stafford, 749 A.2d 489, 500 (2000)................................    v, 11

Commonwealth v. Tyson, 119 A.3d 353 (2015).......................................    v,iii,3,6

Commonwealth v. Zdrale, 530 Pa. 313, 608 A.2d 1037 (1992)......................    5

STATUTES:

Pa.R.Crim.P. 583...................................................................................    1

# STATEMENT OF JURISDICTION

The Pennsylvania Superior Court has jurisdiction pursuant to Pa. R.A.P. § 341 as it is an appeal taken from a final Order of the Court of Common Pleas of Westmoreland County, Pennsylvania.

# STATEMENT OF SCOPE AND STANDARD OF REVIEW

Appellate review of a weight of the evidence claim is a review of the exercise of discretion in ruling on a new trial motion, not of the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Clay*, 619 Pa. 423, 619 A3d. 1049 (2013)

In a challenge to insufficiency of evidence the appellate court must assess the evidence and all reasonable inferences drawn there from in the light most favorable to the verdict winner; it must determine whether there is sufficient evidence to enable the fact finder to find every element of the crime charged beyond as reasonable doubt. *Commonwealth v. Evans*, 901 A.2d 528, 532 (2006)

In a challenge as to an abuse of discretion it is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality, as shown admission by the evidence of record. *Commonwealth v. Tyson*, 119 A.3d 353 (2015).

In a challenge to a motion for mistrial, the stand is within the discretion of the trial court. *Commonwealth v. Stafford*, 749 A.2d 489, 500 (2000).

# ORDER IN QUESTION

COMMONWEALTH vs. CHRISTOPHER L. PETERMAN

SENTENCING     MARCH 19, 2015

PAY COSTS OF PROSECUTION, PERTINENT CONSTABLE FEES, EMSA FEE, MCCARE FUND SURCHARGE, A MONTHLY SUPERVISION FEE DURING TERM OF COURT SUPERVISION, AND COSTS OF TREATMENT OR OTHER ORDERED PROGRAMS. ADULT PROBATION TO DETERMINE PAYMENT SCHEDULE FOR COSTS/FINES. ELIGIBLE TO PARTICIPATE IN A COUNTY REENTRY PROGRAM. LAB FEES: $719.00-PSPCL

HAVE A DRUG & ALCOHOL EVALUATION AND MENTAL HEALTH EVALUATION, FOLLOW RECOMMENDED TREATMENT, AND PAY COSTS. DNA SAMPLE TAKEN AND PAY COSTS.

CT.#1: INCARCERATION FOR A PERIOD OF NOT LESS THAN 9 YEARS NOR MORE THAN 18 YEARS AT DEPT. OF CORRECTIONS, CREDIT FOR TIME SERVED FROM 1/28/12. (DEF IS NOT TO HAVE ANY UNSUPERVISED CONTACT WITH ANY OTHER MINOR CHILD.) ACTOR TO HAVE NO DIRECT/INDIRECT CONTACT WITH EMILEE PETERMAN. VICTIM'S FAMILY PRESENT IN COURT FOR HEARING.

POST SENTENCE AND APPEAL RIGHTS GIVEN.

REMARKS: SWORN TESTIMONY WAS TAKEN FROM ROBIN STIVASON (VICTIM IMPACT STATEMENT). SWORN TESTIMONY WAS TAKEN FROM DEFENSE WITNESSES CLEM PETERMAN, SHEILA PETERMAN AND LISA PETERMAN. COMM. PRESENTED CLOSING ARGUMENT. DEFENSE PRESENT CLOSING ARGUMENT. COMM. PRESENTED REBUTTAL ARGUMENT. THE DEFENDANT PROVIDED A REMORSE STATEMENT.
CT#2: THE DEFENDANT IS SENTENCED TO 8-16 YEARS INCARCERATION (SCI) (CONCURRENT TO CT#1).

CT#3: THE DEFENDANT IS SENTENCE TO 3 ½-7 YEARS INCARCERATION (SCI) (CONCURRENT TO CT#1).
ALL MEDICAL EQUIPMENT IS TO BE RELEASED TO THE APRIA HEALTH CARE COMPANY.
DEF IS TO SUCCESSFULLY COMPLETE A PARENTING PROGRAM AND FOLLOW ALL RECOMMENDATIONS.
DEF IS NOT RRRI ELIGIBLE.
DEFENDANT IS TO REMAIN AT THE W.C.P. FOR 120 DAYS TO ASSIST HIS COUNSEL IN THE APPEAL PROCESS.

# ISSUES RAISED ON APPEAL

I.    WHETHER JUDGE JOHN E. BLAHOVEC ABUSED HIS DISCRETION IN
      DENYING APPELLANT'S PRE-TRIAL MOTION TO SEVER FROM ELIZABETH
      FAIR RESULTING IN AN UNFAIR TRIAL?

ANSWER:    YES.

II.   WHETHER JUDGE RICHARD E. MCCORMICK, JR. ABUSED HIS DISCRETION
      IN DENYING APPELLANT'S PRE-TRIAL MOTION TO OBTAIN ELIZABETH
      FAIR'S MEDICAL RECORDS THAT DENIED HIM A FAIR TRIAL?

ANSWER:    YES.

III.  WHETHER JUDGE MEAGAN BILIK-DEFAZIO ABUSED HER DISCRETION IN
      DENYING APPELLANT A FAIR TRIAL BY ADMITTING PREJUDICIAL HOSPITAL
      PHOTOGRAPHS SHOWING THE VICTIM ATTACHED TO TUBING AND
      MEDICAL DEVICES WITHOUT DISPLAYING ANY VISIBLE INJURIES OR
      ACCURATELY IDENTIFYING AN INJURY?

ANSWER:    YES.

IV.   WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING
      APPELLANT'S CROSS EXAMINATION OF BRANDY TROUT REGARDING
      ELIZABETH FAIR'S POST PARTUM DEPRESSION?

ANSWER:    YES.

V. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN PERMITTING THE TESTIMONY OF TROOPER LEONARD AS AN EXCEPTION TO HEARSAY IN FURTHERANCE OF A CONSPIRACY DENYING THE APPELLANT A FAIR TRIAL?

ANSWER: YES.

VI. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN ALLOWING THE DISPLAY OF THE BASSINET TO THE JURY TO DEMONSTRATE IT COULD NOT HAVE CAUSED THE INJURIES WHEN NEITHER DEFENDANT SAID IT WAS THE CAUSE?

ANSWER: YES.

VII. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION NOT ALLOWING APPELLANT TO CROSS EXAMINE CO-DEFENDANT ON PRIOR BAD ACTS WHICH DENIED HIM A FAIR TRIAL?

ANSWER: YES.

VIII. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL REQUESTING THE COUNT OF CONSPIRACY BE DISMISSED FOR LACK OF EVIDENCE?

ANSWER: YES.

IX.    WHETHER THE GUILTY VERDICT FOR AGGRAVATED ASSAULT AND
       CONSPIRACY TO COMMIT AGGRAVATED ASSAULT WERE AGAINST THE
       WEIGHT OF THE EVIDENCE?

ANSWER:   YES


X.     WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE AGGRAVATED
       ASSAULT AND CONSPIRACY TO COMMIT AGGRAVATED ASSAULT?

ANSWER:   YES.


XI.    WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING
       APPELLANT'S REQUEST FOR MISTRIAL WHEN THE JURY FOREPERSON
       STATED THE JURY WAS HOPELESSLY DEADLOCKED, UNABLE TO REACH A
       VERDICT AND DID NOT WANT TO NEGOCIATE ANY FURTHER?

ANSWER:   YES.

## STATEMENT OF THE CASE

On December 5, 2014, appellant was found guilty by jury to Aggravated Assault, Criminal Conspiracy to Aggravated Assault and to Endangering Welfare of Children (Course of Conduct).

On March 19, 2015, Judge Meagan Bilik-DeFazio sentenced the appellant at Aggravated Assault to 9-18 years incarceration, at Criminal Conspiracy to Aggravated Assault to 8-16 years concurrent incarceration; and, at Endangering Welfare of Children (Course of Conduct) to 3 ½ to 7 years concurrent incarceration.

On March 30, 2015, appellant timely filed a Post-Sentence Motion consisting of a Motion for Acquittal as to Aggravated Assault and Conspiracy to Aggravated Assault, Judgment of Acquittal and a Motion for a New Trial (Weight of the Evidence). On August 17, 2015, all his post-sentence motions were denied.

On September 11, 2015 appellant timely filed a Notice of Appeal to the Pennsylvania Superior Court.

# SUMMARY OF ARGUMENTS

Appellant contends he was denied a fair trial when his pre-trial Motion to Sever from co-defendant Elizabeth Fair was denied. Appellant believes a real prejudice existed at trial and was not mere speculation since the jury found him guilty of aggravated assault and acquitted the co-defendant on identical or similar evidence. *Commonwealth v. Patterson*, 519 Pa 190, 546 A2d 596, 599 (1988).

Appellant contends he was denied a fair trial when his pre-trial Motion to Obtain co-defendant's medical records pertaining to post-partum depression was denied. Appellant was not able to inquire about evidence regarding the co-defendant's state of mind at the time of the alleged crimes. Appellant contends this is real prejudice at trial and was not mere speculation since this denial impacted the evidence during a joint trial. *Patterson, supra.*

Appellant contends he was denied a fair trial when his attempt to cross examine Brandy Trout of the Westmoreland County Children's Bureau regarding post-partum depression was denied. Appellant contends this is real prejudice at trial and not mere speculation since this denial impacted the evidence during a joint trial. Appellant was not able to illicit adverse evidence from the co-defendant which unfairly resulted in a guilty verdict of aggravated assault. *Patterson, supra.*

ii

Appellant contends Judge Bilik-Defazio abused her discretion by admitting unfairly prejudicial hospital photographs of the victim attached to tubing and medical devices without displaying any visible injuries and a 3D image that was not representative of the victim's injury. The photos and image were so highly prejudicial that any probative value was outweighed and denied the appellant a fair trial. *Commonwealth v. Tyson*, 119 A.3d 353 (2015). Also, appellant contends Judge Bilik-Defazio abused her discretion by allowing the bassinet to be displayed to the jury since the prejudicial impact outweighed any probative value and denied him a fair trial. *Tyson, supra.*

Appellant contends Judge Bilik-Defazio abused her discretion by permitting statements of the co-defendant made in furtherance of the conspiracy to a law enforcement officer. Appellant believes the testimony was inadmissible, irrelevant and reversible error denying him a fair trial. Appellant's alleged statements to Elizabeth Fair's were not in furtherance of a conspiracy.

Appellant contends that the verdict was against the weight and sufficiency of the evidence to establish aggravated assault or conspiracy to commit aggravated assault. Appellant believes the Commonwealth did not prove the required element of an agreement either through direct or circumstantial evidence to Aggravated Assault and Conspiracy and to Aggravated Assault. *Commonwealth v. Dolfi*, 483 Pa. 266, 396 A.2d 635, 627 (1979).

Appellant contends Judge Bilik-Defazio abused her discretion in denying his motion for judgment of acquittal made at the close of the Commonwealth's case-in-chief requesting the count of Conspiracy to Aggravated Assault be dismissed for lack of evidence to go to the jury. *Dolfi, supra.*

As to the count of Aggravated Assault, Appellant contends the Commonwealth presented the same evidence against the two defendants and there is no evidentiary basis for the jury to return with the inconsistent guilty verdict against the appellant and not against Elizabeth Fair.

Appellant contends Judge Bilik-Defazio abused her discretion in denying his attempt to introduce prior bad acts of the co-defendant. Judge Bilik-Defazio ruled that the prior bad acts could only be admitted if the acts resulted in a conviction. However, defendant believes that *Commonwealth v. Barger*, 743 A.2d 447, 481 (1999) is controlling and stands for the proposition that a defendant in a criminal case may introduce bad act evidence when he contends someone else is criminally responsible for the offense or a cautionary instruction to the jury for a limited purpose of which the evidence is admitted. Appellant was not able to zealously defend his case which denied him a fair trial.

Appellant contends Judge Bilik-Defazio abused her discretion in denying his motion for judgment of acquittal as to Conspiracy to Commit Aggravated Assault. Appellant contends the jury verdict was against the weight of the evidence. The lack of evidence shock one's sense of

justice to support a guilty verdict since there is no direct or circumstantial evidence that he committed conspiracy to commit aggravated assault.

Appellant contends the jury verdict was against the sufficiency of the evidence to allow the fact finder to find every element of aggravated assault or conspiracy to commit aggravated assault.

Appellant contends Judge Bilik-Defazio abused her discretion and erred in not granting his request for mistrial when the jury foreperson stated that the jury was hopelessly deadlocked, unable to reach a verdict and did not want to negotiate any further.

# **ARGUMENTS**

I.     WHETHER JUDGE JOHN E. BLAHOVEC ABUSED HIS DISCRETION IN DENYING APPELLANT'S PRE-TRIAL MOTION TO SEVER FROM ELIZABETH FAIR RESULTING IN AN UNFAIR TRIAL?

ANSWER:    YES.

It is advisable to have joint trials when the crimes charged grew out of the same acts and much of the same evidence is necessary or applicable to both defendants. *Commonwealth v. Morales*, 508 Pa. 51, 61, 494 A.2d 367, 372 (1985). In this case, the evidence presented against the appellant and co-defendant, Elizabeth Fair (hereafter referred to as "Fair") grew out of the same acts and much of the same evidence. However, the court may order separate trials of defendants if it appears that any party may be prejudiced by defendants being tried together. Pa.R.Crim.P. 583.

The Commonwealth presented Rachel Berger, M.D. and qualified her as an expert in the field of pediatrics and child abuse. Trial Transcript page ( TT p.) 196. Dr. Berger testified that she can't tell looking at Emily Peterman's (hereafter referred to as "victim) injuries whether a male or female caused those injuries. TT p. 300.

1

Appellant believes a real prejudice existed at trial and was not mere speculation since the jury found him guilty and Fair not guilty of aggravated assault on the same evidence. *Commonwealth v. Patterson*, 519 Pa 190, 546 A2d 596, 599 (1988). The jury based the verdict on the identical evidence that did not identify who committed the assaults. Also, Fair testified on her behalf. Appellant chose not testify, for trial tactics, because of his crimen falsi convictions. This further evidences that appellant suffered a real prejudice with a joint trial and was denied a fair trial. Therefore, Judge Blahovec erred in denying the appellant's pre-trial motion to sever that resulted in him receiving an unfair trial.

II. WHETHER JUDGE RICHARD E. MCCORMICK, JR. ABUSED HIS DISCRETION IN DENYING APPELLANT'S PRE-TRIAL MOTION TO OBTAIN ELIZABETH FAIR'S MEDICAL RECORDS THAT DENIED HIM A FAIR TRIAL?

ANSWER: YES.

Appellant contends he was denied a fair trial when his pre-trial Motion to Obtain Fair's medical records regarding her post-partum depression was denied. Appellant was not able to inquire about evidence regarding the Fair's state of mind at the time of the alleged crimes. Appellant contends this is real prejudice at trial and was not mere speculation since this denial impacted the evidence during a joint trial. *Patterson, id 600.*

III.    WHETHER JUDGE MEAGAN BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING APPELLANT A FAIR TRIAL BY ADMITTING PREJUDICIAL HOSPITAL PHOTOGRAPHS SHOWING THE VICTIM ATTACHED TO TUBING AND MEDICAL DEVICES WITHOUT DISPLAYING ANY VISIBLE INJURIES OR ACCURATELY IDENTIFYING AN INJURY?

ANSWER:    YES.

Appellant contends Judge Bilik-Defazio erred and abused her discretion by admitting hospital photographs showing the victim attached to tubing and medical devices without displaying any visible injuries and a 3D image that was not representative of the victim's injury. The photos and image were so highly inflammatory that any probative value was outweighed by the prejudicial impact that it denied the appellant a fair trial. *Commonwealth v. Tyson*, 119 A.3d 353 (2015).

Appellant argued that the photos were not representative of the Emilee's injuries highly prejudicial and an attempt to shock the jury. TT pp. 214-218. Dr. Berger testified Emilee's injuries are not shown in the photos since her head, arms, chest and leg are covered and do not show any injuries. TT pp. 223 - 228.

3

Appellant contends Judge Bilik-Defazio erred and abused her discretion by admitting a 3D image. Appellant objected that the 3D image was not representative of the child's fracture since Dr. Berger testified the image reflects the victim had a fracture on the left side of her skull while all medical reports indicate a fracture was on the right temporal skull. TT p 237.

IV. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING APPELLANT'S CROSS EXAMINATION OF BRANDY TROUT REGARDING ELIZABETH FAIR'S POST PARTUM DEPRESSION?

ANSWER: YES.

During the trial, appellant attempted to have Brandy Trout, an assessment caseworker with the Westmoreland County Children's Bureau, testify that she received information that the Fair may have post-partum depression. TT p. 181. Appellant was not permitted to explore this inquiry since the Court ruled the answer only called for speculation. TT p. 184.

The question called for a yes or no answer and did not call for speculation since the witness testified under oath at a different hearing that she received this information that the Fair may have postpartum depression. Moreover, appellant argued that the Fair was recommended on two occasions to get a postpartum evaluation and she never went. TT p. 384.

4

Appellant contends this is real prejudice at trial and was not mere speculation since this denial impacted the evidence during a joint trial. *Patterson, supra.* Further, appellant contends that he was denied a fair trial by not eliciting this testimony that impacted the jury's decision as to aggravated assault.

V.    WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN PERMITTING THE TESTIMONY OF TROOPER LEONARD AS AN EXCEPTION TO HEARSAY IN FURTHERANCE OF A CONSPIRACY DENYING APPELLANT FAIR TRIAL?

ANSWER:    YES.

Appellant contends Judge Bilik-Defazio erred and abused her discretion by allowing the testimony of Trooper Leonard regarding appellant's statements made to Fair in furtherance to the conspiracy exception to hearsay. A co-conspirator exception requires the existence of a conspiracy between the declarant and the defendant and must be demonstrated by a preponderance of the evidence; the statements must be shown to have been made during the course of the conspiracy; and they must have been made in furtherance of the common design. *Commonwealth v. Zdrale*, 530 Pa. 313, 608 A.2d 1037 (1992).

Appellant believes Fair's statements to Trooper Leonard were her recollection of his actions as to where the baby was sleeping and where the appellant was at the time

5

that the baby awoke on October 17, 2012. TT pp. 419-421. These statements were not made in furtherance of a conspiracy and the admission is reversible error denying the defendant a fair trial.

VI.     WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN ALLOWING THE DISPLAY OF THE BASSINET TO THE JURY TO DEMONSTRATE IT COULD NOT HAVE CAUSED THE INJURIES WHEN NEITHER DEFENDANT SAID IT WAS THE CAUSE?

ANSWER:   YES.

Appellant contends Judge Bilik-Defazio erred and abused her discretion by allowing the jury to be shown the bassinet to demonstrate it could not have caused the injuries. Appellant believes the jury is receiving irrelevant and prejudicial evidence that exceeded any probative value that denied him a fair trial. *Commonwealth v. Tyson*, 119 A.3d 353 (2015). Appellant never stated the bassinet caused the injuries. TT pp 511-513.

VII.    WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION NOT ALLOWING APPELLANT TO CROSS EXAMINE CO-DEFENDANT ON PRIOR BAD ACTS WHICH DENIED HIM A FAIR TRIAL?

ANSWER:   YES.

The admission of evidence of prior bad acts is solely within the discretion of the trial court, and the court's decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 534 (2005). The alleged incidents involving Fair did not involve convictions for crimes of dishonesty or false statements, and did not result in convictions; thus, they were inadmissible as prior bad acts evidence under Pa.R.E. 608(b) and 609.

Appellant contends Judge Bilik-Defazio abused her discretion in denying his attempt to introduce prior bad acts of the co-defendant. Judge Bilik-Defazio ruled that the prior bad acts could only be admitted if the acts resulted in a conviction. However, defendant believes that *Commonwealth v. Barger*, 743 A.2d 477 (1988) is controlling and stands for the proposition that a defendant in a criminal case may introduce bad act evidence when he contends someone else is criminally responsible for the offense.

Appellant contends Judge Bilik-Defazio abused her discretion denying his attempt to impeach the co-defendant's character of non-violence. Appellant was prohibited since the co-defendant's prior bad acts did not result in a conviction; however, appellant was not able to zealously defend his case which denied him a fair trial. *Barger,* id. This denial shows the prejudice that required a severed trial.

7

VIII.   WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL REQUESTING THE COUNT OF CONSPIRACY BE DISMISSED FOR LACK OF EVIDENCE?

ANSWER:   YES.

Appellant contends Judge Bilik-Defazio abused her discretion in denying his motion for judgment of acquittal made at the close of the Commonwealth's case-in-chief requesting the count of Conspiracy to Aggravated Assault be dismissed for lack of evidence to go to the jury. *Commonwealth v. Dolfi*, 483 Pa. 266, 396 A.2d 635, 627 (1979).

If the conviction is based wholly on inferences, suspicion and conjecture, it cannot stand. *Commonwealth v. Simpson, 436 Pa. 459, 260 A.2d 751 (1970).* Therefore the Conspiracy to Commit Aggravated Assault should be reversed since it was based only on conjecture, inferences and suspicion.

IX.   WHETHER THE VERDICT FOR AGGRAVATED ASSAULT AND CONSPIRACY TO COMMIT AGGRAVATED ASSAULT WERE AGAINST THE WEIGHT OF THE EVIDENCE?

ANSWER:   YES

A new trial should not be granted because of a mere conflict or on the same facts a different conclusion was reached. However, "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and award of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994).

Appellant contends the jury verdict was against the weight of the evidence as to shock one's sense of justice in that neither the direct nor circumstantial evidence indicated that he committed conspiracy to commit aggravated assault to support a guilty verdict.

X. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE AGGRAVATED ASSAULT AND CONSPIRACY TO COMMIT AGGRAVATED ASSAULT?

ANSWER: YES.

In a challenge to insufficiency of evidence the appellate court must assess the evidence and all reasonable inferences drawn there from in the light most favorable to the verdict winner; it must determine whether there is sufficient evidence to enable the fact finder to find every element of the crime charged beyond as reasonable doubt. *Commonwealth v. Evans*, 901 A.2d 528, 532 (2006).

Appellant contends the jury verdict was against the sufficiency of the evidence to allow the fact finder to find every element of aggravated assault or conspiracy to commit aggravated assault. The evidence presented by the Commonwealth against the appellant was the same presented against Fair. The evidence did not differentiate between the co-defendants. In fact, Dr. Berger testified that she can't tell looking at Emily Peterman's injuries whether a male or female caused those injuries. TT p. 300. Moreover, Dr. Berger stated that she can't discriminate whether a male or female caused the injuries to the child. TT p. 303.

The jury returned with a guilty verdict against the appellant to Aggravated Assault. The jury acquitted Fair to the same charge. Appellant contends there is no legal basis for the jury to return with an inconsistent guilty verdict against the appellant and not with the co-defendant. Appellant believes the jury did not have sufficient evidence to enable the fact finder to find aggravated assault beyond as reasonable doubt. *Evans*, id at *532*.

XI. WHETHER JUDGE BILIK-DEFAZIO ABUSED HER DISCRETION IN DENYING APPELLANT'S REQUEST FOR MISTRIAL WHEN THE JURY FOREPERSON STATED THE JURY WAS HOPELESSLY DEADLOCKED, UNABLE TO REACH A VERDICT AND DID NOT WANT TO NEGOCIATE ANY FURTHER?

ANSWER: YES.

The jury recessed for deliberations at approximately 3:35 p.m. TT p. 842. At 5:38 p.m. court reconvened with two questions and recessed again at 5:47 p.m. TT p. 849. At 9:22 p.m., proceedings reconvened at counsel were advised that the jury was deadlocked as to at least charge. TT p. 849. The foreperson stated that the jury did not need further instruction and there was no possibility of the jury reaching a unanimous verdict. Also, the foreperson stated additional time would not be a benefit. TT p. 852. The proceedings recessed at 9:37 p.m. and reconvened at 9:54 p.m. Finally, the jury returned with a verdict at 10:32 p.m. Clearly, the jury had difficulty reaching a decision and felt obligated to return with a verdict.

A motion for mistrial is within the discretion of the trial court. *Commonwealth v. Stafford*, 749 A.2d 489, 500 (2000). A mistrial, upon a defendant's request, is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. *Commonwealth v. Lease*, 703 A.2d 506, 508 (1997). Appellant contends Judge Bilik-Defazio abused her discretion and erred in not granting his request for mistrial when the jury foreperson stated that the jury could not reach a unanimous verdict, unable to reach a verdict and did not want to negotiate any further. This refusal to grant a mistrial deprived the appellant a fair and impartial trial.

11

# CONCLUSION

Appellant believes his verdict should be reversed and the case be remanded to the Court of Common Pleas for a new trial since various judges abused their discretion when making rulings that denied him a fair trial. Moreover, the testimony presented at trial was against the weight and sufficiency of the evidence as to the crimes of aggravated assault and conspiracy to commit aggravated assault.

WHEREFORE, appellant prays this Honorable Court to rule in his favor and grant a new trial.

Respectfully submitted,

OFFICE OF THE PUBLIC DEFENDER

Gregory L. Cecchetti, Esquire
Assistant Public Defender

12

IN THE SUPERIOR COURT OF PENNSYLVANIA, SITTING IN PITTSBURGH
COMMONWEALTH OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA

vs.                                                  NO.   1412 WDA 2015

CHRISTOPHER LAWRENCE PETTERMAN


## PROOF OF SERVICE


I hereby certify that I am this _____18th_____ day of December, 2015, serving the foregoing

document upon the person and in the manner indicated below, which services satisfies the

requirements of Pa. R.A.P. 121 and 906:


## SERVICE IN PERSON


Judith Petrush
Assistant District Attorney
Westmoreland County
Courthouse Square
Greensburg, Pennsylvania 15601

_____
Gregory L. Cecchetti, Esquire
Attorney for Appellant


13

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
vs. ) NO. 600 C 2013
)
CHRISTOPHER LAWRENCE PETERMAN )

## OPINION AND ORDER OF COURT

The above-captioned case is before this Court for disposition of Defendant's Post-Sentence Motions filed pursuant to Pennsylvania Rules of Criminal Procedure 720(B). The defendant, Christopher Lawrence Peterman (hereinafter "Defendant") was charged with the following crimes:

Count 1- Aggravated Assault, 18 Pa.C.S.A. § 2702(a)(1), 1st degree felony.

Count 2- Criminal Conspiracy -- Aggravated Assault and/or Endangering the Welfare of Children, 18 Pa.C.S.A. § 903(a)(1), 1st degree felony.

Count 3- Endangering the Welfare of Children, 18 Pa.C.S.A. 4304(a)(1), 3rd degree felony.

The charges stem from an investigation by Pennsylvania State Police Trooper Todd Adamski (hereinafter "Tpr. Adamski") into the report received from Westmoreland County Children's Bureau (hereinafter "WCCB") regarding suspected child physical abuse of Defendant and Co-Defendant, Elizabeth Mae Fair's infant, E.P. The initial report indicated that WCCB received a report from Childline regarding an infant that was transported to Westmoreland Hospital for treatment, and because of the injuries, the infant was then flown via helicopter from Westmoreland Hospital to Children's Hospital of Pittsburgh. Tpr. Adamski spoke with E.P.'s attending doctor, who informed him regarding E.P.'s injuries. Tpr. Adamski was advised that both of E.P.'s right and left ulna bones were broken and that they were healing at different stages, her right femur was broken at an uncommon location, she had multiple rib fractures, a pulmonary contusion caused from trauma, laceration of her spleen, contusions on both lungs, a right temporal skull fracture, and that, her sustained injuries were near fatal. After speaking with E.P.'s doctors and her nurse, a WCCB caseworker, and both of E.P.'s parents, who provided statements, Tpr. Adamski obtained and executed a search warrant of the family's residence.

App. A

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   )
)
vs.                 )   NO.   600 C 2013
)
CHRISTOPHER LAWRENCE PETERMAN   )

## OPINION AND ORDER OF COURT

The above-captioned case is before this Court for disposition of Defendant's Post-Sentence Motions filed pursuant to Pennsylvania Rules of Criminal Procedure 720(B). The defendant, Christopher Lawrence Peterman (hereinafter "Defendant") was charged with the following crimes:

Count 1- Aggravated Assault, 18 Pa.C.S.A. § 2702(a)(1), 1st degree felony.

Count 2- Criminal Conspiracy – Aggravated Assault and/or Endangering the Welfare of Children, 18 Pa.C.S.A. § 903(a)(1), 1st degree felony.

Count 3- Endangering the Welfare of Children, 18 Pa.C.S.A. 4304(a)(1), 3rd degree felony.

The charges stem from an investigation by Pennsylvania State Police Trooper Todd Adamski (hereinafter "Tpr. Adamski") into the report received from Westmoreland County Children's Bureau (hereinafter "WCCB") regarding suspected child physical abuse of Defendant and Co-Defendant, Elizabeth Mae Fair's infant, E.P. The initial report indicated that WCCB received a report from Childline regarding an infant that was transported to Westmoreland Hospital for treatment, and because of the injuries, the infant was then flown via helicopter from Westmoreland Hospital to Children's Hospital of Pittsburgh. Tpr. Adamski spoke with E.P.'s attending doctor, who informed him regarding E.P.'s injuries. Tpr. Adamski was advised that both of E.P.'s right and left ulna bones were broken and that they were healing at different stages, her right femur was broken at an uncommon location, she had multiple rib fractures, a pulmonary contusion caused from trauma, laceration of her spleen, contusions on both lungs, a right temporal skull fracture, and that, her sustained injuries were near fatal. After speaking with E.P.'s doctors and her nurse, a WCCB caseworker, and both of E.P.'s parents, who provided statements, Tpr. Adamski obtained and executed a search warrant of the family's residence.

As a result of his investigation, Tpr. Adamski filed the above-referenced charges against Defendant. Following Defendant's arrest, Magisterial District Judge Jason Buczak conducted a preliminary hearing on February 7, 2013, and held the case for court. On April 9, 2013, the Commonwealth filed a Notice to Consolidate with the case of Commonwealth v. Elizabeth Mae Fair, 587 C 2013. On July 22, 2013, Defendant's Motion to Sever with the aforementioned case was DENIED by Judge John E. Blahovec. Defendant's Motion for R.O.R. or Motion for Nominal Bond and Defendant's Petition for Conditions of Bond to be Modified were DENIED by Judge Blahovec on October 25, 2013. On March 24, 2014, Defendant's Petition for Disclosure of Mental Health Records and Defendant's Rule 600 Motion were DENIED by Judge Richard E. McCormick. Jury selection commenced on December 1, 2014, and a trial by jury was conducted on December 2, 2014 through December 5, 2014.

On December 5, 2014, Defendant was found guilty at all counts. At that time, bond was revoked, a Pre-Sentence Investigation was ordered, and a Sentencing Hearing was to be scheduled within ninety (90) days.

On March 19, 2015, after a Sentencing Hearing was held, at Count 1, Defendant was sentenced to a state correctional institution for a period of not less than nine (9) years nor more than eighteen (18) years. At Count 2, Defendant was sentenced to a state correctional institution for a period of not less than eight (8) years nor more than sixteen (16) years, concurrent to Count 1. At Count 3, Defendant was sentenced to a state correctional institution for a period of not less than three and one half (3 ½) years nor more than seven (7) years, concurrent to Count 1. Defendant was determined to not be RRRI eligible and was given credit for time served. Defendant timely filed the following Post-Sentence Motions:

I.     Motion for Acquittal as to Aggravated Assault.

II.    Motion for Acquittal as to Conspiracy to Commit Aggravated Assault.

III.   Motion in Arrest of Judgment.

IV.    Motion for New Trial: Weight of the Evidence.

## FACTS

At approximately 3:55 p.m., on October 20, 2012, Westmoreland Hospital Emergency Department Registered Nurse Carolyn Yoder began treating three (3) month old E.P.[1] when she was brought into the emergency room by her parents, Defendant and Elizabeth Fair (hereinafter "Fair"). N.T. December 1-5, 2014, 343-344[2]. Ms. Yoder testified that both parents were present and provided the information that E.P. was sick during the day, that the parents had done C.P.R. on E.P. twice, that the bassinet had fallen on E.P., and the parents brought E.P. to the hospital. N.T. 345. Ms. Yoder observed that E.P. was very pale and dusky, that her lips were blue, she had a bluish/white tint to all of her extremities, she was cool to the touch, her oxygen saturation was in the 80's[3] and that, although E.P. was trying to cry, it was a very weak cry. N.T. 345-346. Ms. Yoder recalled that both parents stayed off in the distance from the hospital staff which, based on her experience, was abnormal. N.T. 346. Admittedly though, Ms. Yoder did not know Defendant and Fair prior to this incident and Ms. Yoder testified that it wouldn't be unusual for parents who love a child to be in shock when their baby is very sick. N.T. 351-352. Ms. Yoder testified that, when the hospital staff was undressing E.P., when she noticed that E.P.'s right thigh was at least two (2) to three (3) times more swollen than the left thigh, one of the parents remarked that E.P.'s diaper may have been too tight. N.T. 348.

Shortly after 4:09 p.m., Westmoreland Hospital Emergency Department Physician Dr. John Peoples[4] joined in the treatment of E.P. N.T. 391-392. Dr. Peoples testified that E.P. immediately presented with difficulty in breathing and, due to the severity of E.P.'s injuries, Dr. Peoples was only able to speak to Defendant and Fair for a short period of time.[5] N.T. 392. Defendant and Fair provided a brief birth history, Defendant relayed concern regarding a bassinet collapse four (4) days prior, and Fair advised that, on that day, four (4) days prior, E.P. had a period of twenty (20) to thirty (30) seconds where she was not

---

[1] On July 20, 2012, 30 weeks into Defendant's pregnancy, E.P. was born premature at Westmoreland Hospital. N.T. December 1-5, 2014, p. 609-610 (To decrease the length of each citation, the notes of testimony regarding the trial will hereafter be referred to as "N.T."). As a result of her prematurity, E.P.'s lungs and brain were underdeveloped and thus E.P. was transported to West Penn Hospital, where she stayed for a month and a half. N.T. 610-611. E.P. was then transferred to the Children's Home where Defendant and Peterman were able to stay with E.P. while they learned how to use the oxygen and monitors that E.P. required. N.T. 611. E.P. was discharged home to Defendant and Peterman from the Children's Home on September 24, 2012. N.T. 611-612. Although E.P. was discharged home, E.P. required a pulse oximeter, which kept track of her oxygen levels, and an A&B monitor, which kept track of her heart rate and breaths. N.T. 613. If E.P. quit breathing or breathed too fast for a certain amount of time, or, if her heartbeat was too low or too high, the A&B monitor would go off. N.T. 613.

[2] The Trial in this matter occurred from December 1-5, 2014.

[3] Ms. Yoder testified that a normal, healthy infant would have between 95-100 oxygen saturation levels. N.T. 346.

[4] Dr. Peoples testified as an expert in emergency medicine. N.T. 390.

[5] Dr. Peoples testified that he spoke to Defendant and Peterman at the same time for maybe five (5) to ten (10) minutes. N.T. 410-411, 412.

3

breathing and they initiated CPR.[6] N.T. 392. Upon initial examination, Dr. Peoples testified that, E.P. presented with respiratory distress, a frontal hematoma over the front of the scalp, and swelling, redness, and enlargement of the right leg. N.T. 395-396. X-rays showed multiple rib fractures on both the left and right sides, a mid-shaft femur fracture, and radius and ulna fractures on both arms. N.T. 398-399. Dr. Peoples testified that there was some varying ages to the radius and ulna fractures. N.T. 400.

Based upon E.P.'s significant difficulty breathing and the concern for injury and trauma, Dr. Peoples decided to intubate E.P., transfer her care to CHP, which provides a higher level of care for more severe patients, and Children and Youth Services were consulted regarding the concern for non-accidental trauma. N.T. 397-398, 401. Dr. Peoples explained that the femur fracture and the rib fractures are fairly uncommon fractures for a three-month old child, and that, because children's bones are fairly compliant and tend to bend, the rib fractures are uncommon even if CPR is performed. N.T. 401, 403. Additionally, Dr. Peoples testified that it is rare to see multiple rib fractures on both sides or mid-shaft femur fractures that are separated, which is what he saw with E.P. N.T. 403. Dr. Peoples described E.P.'s condition as critical and opined that a single impact would not account for the injuries that he observed in E.P. N.T. 408-409.

E.P. was intubated and flown by helicopter to CHP. N.T. 398. Dr. Rachel Berger, a pediatrician and the Division Chief for the Division of Child Advocacy at CHP, who has dealt with thousands of child abuse cases in her career, testified as an expert in pediatrics and child abuse. N.T. 190-191, 196, 297. Dr. Berger became involved in E.P.'s case when one of the emergency room physicians, who examined E.P. and who was concerned about child abuse, called Dr. Berger, who was on-call for the Child Protection Team, to consult regarding the concerns. N.T. 197, 200. After the consult, Dr. Berger looked at the electronic medical records, reviewed the x-rays with the radiologist, and spoke to Defendant and Fair in a conference room at the hospital. N.T. 200.

During the consultation with both Defendant and Fair present, Dr. Berger asked the parents to tell her the last time E.P. was her usual self and there was nothing wrong with E.P. N.T. 203. Fair told Dr. Berger that E.P. was well until October 18th. N.T. 203. Fair reported that she was home with E.P. alone when the A&B monitor[7] went off. N.T. 203. Fair stated that she left the kitchen, went in the other part of the trailer,

---

[6] Dr. Peoples testified that Defendant and Peterman only told him of one incident in which CPR was performed on E.P. by the parents. N.T. 395.

[7] Dr Berger explained that an A&B monitor is an apnea and bradycardia monitor, that alarms if the heart stops or if someone stops breathing for a certain amount of time, so the parents can know that something is wrong and they can stimulate the baby. N.T. 203-204. E.P. was premature, therefore her respiratory system wasn't mature and thus, E.P. was sent home with the monitor. N.T. 203.

4

which was only a few feet away, and stimulated E.P. by rubbing her chest and pinching her toe, but E.P. did not respond. N.T. 204. Fair then gave E.P. CPR and, after two (2) or three (3) breaths, E.P. spit up some formula, began breathing, and, because E.P. seemed fine, Fair took no further action. N.T. 204-205. Fair reported that Defendant came home from work a few hours later and, because Defendant and Fair discussed that E.P. was okay, neither felt medical treatment was necessary. N.T. 205.

Fair advised Dr. Berger that E.P. was fine on October 19th, but, in the late afternoon on October 20th, E.P.'s monitor went off right after Defendant fed E.P. N.T. 205. Both Defendant and Fair walked over to E.P. and when they saw that her lips were blue, her eyes were closed, and E.P. was not responsive, Defendant pinched E.P.'s toe and gave her CPR. N.T. 205-206. Defendant said that E.P. jerked, began to cry, and then seemed to be fine. N.T. 206. Neither parent did anything further until Fair, while putting E.P.'s sleeper on, noticed E.P.'s swollen leg. N.T. 206. Fair said the swollen leg wasn't bothering E.P., but the parents called the pediatrician who told them to go to the emergency room, which they did. N.T. 206.

Although neither Defendant nor Fair initially brought up the issue of the bassinet falling, when Dr. Berger asked them about any other trauma or the specific injuries, Defendant brought up the bassinet issue. N.T. 206. Defendant reported that on October 17th, which was the day before the first event that Fair reported, Defendant heard E.P. whimpering around 3:30 in the morning. N.T. 206. Defendant said that he immediately woke up and noticed that the bassinet[8] had fallen from itself. N.T. 206-207. Defendant stated that the screws broke and the bassinet fell onto the oxygen tank that was underneath the bassinet carrier and on top of the cloth shelf. N.T. 207. Defendant explained that E.P. did not fall out of the bassinet carrier, but that the bassinet carrier had fallen and kind of turned. N.T. 207. They had the actual bassinet with them and Dr. Berger testified that the "fall distance" would have been about eight (8) inches.[9] N.T. 207, 510. Defendant reported that E.P. was awake and didn't seem hurt so they took the bassinet carrier out and put it on the floor. N.T. 207. Neither parent sought medical attention for E.P. after that incident. N.T. 207.

---

[8] The bassinet was admitted into evidence without objection. N.T. p. 498. The bassinet consists of two separate apparatus, the bassinet carrier, within which the child would be placed, and the metal frame. N.T. p. 499. When extended, the metal frame looks like a V-shape, but when not extended, it folds up similar to an accordion. N.T. 502. When extended to the proper level, there are two plastic clips that clip onto the metal frame, one on each side, to secure the bassinet carrier to the frame. N.T. 502. There is also a cloth-type shelf underneath the bassinet on the frame which is where E.P.'s oxygen tank was located. N.T. 501.
[9] Tpr. Adamski testified that the "fall distance" was between eight (8) to ten (10) inches. N.T. 510.

5

Dr. Berger physically examined E.P. in the pediatric intensive care unit on October 22, 2012. N.T. 213, 222. Upon examination, E.P. was sedated, intubated on 100 percent oxygen,[10] on cardiac support,[11] she required a blood transfusion, and was on about as much support as someone can possibly be on without being on ECMO. N.T. 226, 271. Dr. Berger testified that, without the pressor support or the external oxygen, E.P. would have stopped breathing and died. N.T. 226. E.P. was so sick and her illness so severe that Dr. Berger was unable to do some of the things that she would normally do to examine an infant, such as looking in the mouth and turning the infant over to check the back and skin. N.T. 213. In addition to the necessary support, E.P. presented with multiple fractures at different stages of healing, including more than twenty (20) rib fractures, a metaphyseal femur fracture[12], an acute transverse femur fracture in the right leg, a very large, fairly acute, fracture of the parietal bone in the skull, the right arm had an acute[13] radius fracture, and the left arm had both subacute[14] radius and ulna fractures. N.T. 225, 227, 231, 248, 272, 399. E.P. also had perisplenic and retroperitoneal hematoma, the blood in the back, and possible splenic laceration, four small subdural hemorrhage and extradural hematoma, a single retina hemorrhage in her eye, and five contusions or bruising at the base of the lungs. N.T. 240, 246, 266-267, 270, 272, 273.

Throughout the family, medical, and social history that both parents provided to Dr. Berger, neither parent provided any significant history which would account for or provide an explanation for E.P.'s injuries. N.T. 203-213. Dr. Berger testified that the hospital tested E.P. for oxygenesis imperfecta, which is a rare disease that causes children's bones to fracture more easily, but E.P. tested negative for that genetic disease. N.T. 229-230. Additionally, the hospital conducted multiple lab tests which could indicate another reason for E.P.'s injuries, but all of the lab reports that Dr. Berger reviewed did not provide an explanation for the trauma that E.P. sustained. N.T. 230. Dr. Berger explained that, based on her evaluation, E.P. looked like a child that had been injured but not a child that had an underlying medical problem. N.T. 230-231.

---

[10] Dr. Berger testified that, normally, the air is 21 percent oxygen and the most that can be given to someone is 100 percent oxygen, which is what E.P. was on. N.T. 226. Dr. Berger further testified that they don't normally like to give 100 percent oxygen because it is toxic, particularly for infants, but E.P. needed that level of oxygen because E.P. wasn't breathing well at all. N.T. 226.

[11] Dr. Berger testified that E.P.'s heart wasn't pumping properly so E.P. was on pressors (epinephrine or norepinephrine) almost constantly to keep the heart pumping in order to support it. N.T. 226.

[12] Dr. Berger explained that this fracture is essentially the growth plate on the femur being ripped off. N.T. 251-252.

[13] "Acute" means that the injury is new and you don't see healing. N.T. 248.

[14] "Subacute" means that there is some evidence of healing which means that it is probably more than three (3) days old, but probably less than seven (7) days old. N.T. 249.

6

Dr. Berger explained that more than twenty (20) rib fractures[15] were healing in at least three different stages. N.T. 267-268. Dr. Berger testified that, the metaphyseal femur fracture has great significance because there is no accidental way to cause that type of injury. N.T. 252. Other than a breeched baby where the doctor yanks the baby out, the only other known mechanism that can cause that type of injury is child abuse. N.T. 252. Dr. Berger also explained that the metaphyseal femur fracture would have had to occur before the acute transverse femur fracture, but not at the same time. N.T. 256-258. Lastly, Dr. Berger explained that a transverse fracture is incredibly painful and one of the most painful fractures and, even changing a diaper on a baby with that kind of fracture, would be incredibly uncomfortable. N.T. 258. Regarding the posterior rib fractures, Dr. Berger explained that those types of rib fractures are almost only from a squeezing and twisting, which are almost pathologic of abuse. N.T. 276-277. Additionally, Dr. Berger explained that you almost never get rib fractures from CPR, even in children and babies, regardless of whether the CPR is being performed by a professional or lay person. N.T. 277.

When questioned by Dr. Berger regarding any other possible caretakers for E.P., both parents reiterated that they were the only caretakers for E.P. N.T. 212. Ultimately, based upon all of the information that Dr. Berger reviewed, her examination of E.P., the history that she obtained, and all of the radiographic images that she reviewed, including the follow-up information, Dr. Berger opined that E.P.'s constellation of injuries were the result of child physical abuse which occurred on more than one occasion, that the injuries were life threatening, that E.P. did not have any underlying medical condition which would cause the injuries, that, although E.P. was premature, E.P.'s bones may be slightly weaker than a full-term infant, but that would not account for the injuries and would require significant force even in a premature baby. N.T. 273.

Dr. Berger also opined that the history of the fall from the bassinet could have accounted for one of the injuries, but that it did not account for all of the injuries, and that, E.P. was in significant pain at the time the fractures occurred. N.T. 273. Dr. Berger testified that it is not possible for an adult who is caring for her when both the bones in E.P.'s forearms were fractured to not know something was wrong and that it's not possible that E.P. was not in pain when the femur was fractured because it would be extremely painful when it occurred and afterwards. N.T. 273. Dr. Berger stated that the lack of seeking medical attention for E.P.'s injuries, as well as for the event in which Defendant gave chest compressions and rescue breaths, constitutes medical neglect. N.T. 273. Dr. Berger also explained that, after E.P. was in foster care, Dr. Berger did see her at the hospital and all of the fractures had healed and E.P. had no additional fractures at

---

[15] Some of the rib fractures were lateral, anterior, and some were posterior. N.T. 262.

that time. N.T. 281. Dr. Berger concluded that there would be no other explanation of E.P.'s injuries other than her diagnosis of child abuse. N.T. 282.

The WCCB became involved in this case when the on-call caseworker Amie Skolak (hereinafter "Ms. Skolak") received a referral from ChildLine, the child abuse registry in Pennsylvania, regarding E.P. at approximately 7:08 p.m. on October 20, 2012. N.T. 131-132, 142. At approximately 10:14 p.m., after speaking to a social worker at CHP by telephone, Ms. Skolak testified that she spoke to Defendant by telephone. N.T. 133. Defendant provided identifying information and, after Ms. Skolak made Defendant aware of the injuries reported in the ChildLine referral, Defendant reported that E.P.'s injuries were likely from a bassinet fall. N.T. 135, 147-149. Defendant reported to Ms. Skolak that E.P. was in an accordion style bassinet which utilizes two pins to hold the unit together. N.T. 135. Defendant stated that when one of the pins broke, the bassinet, with E.P. in it, fell onto a canopy below the bassinet which housed E.P.'s oxygen tank. N.T. 135. When that occurred, E.P. was fussing, but had no visible marks, no swelling, and E.P. continued to eat well. N.T. 135.

Otherwise, Defendant reported an incident which occurred approximately three days prior where, after feeding E.P., E.P. started to burp up, then she quit breathing, and Fair performed CPR. N.T. 135. Ms. Skolak advised Defendant that she was required to see E.P. at the hospital and to meet with him and Fair within twenty-four (24) hours of the report. N.T. 136. Although Defendant gave Ms. Skolak a time that he and Fair would be at CHP the following day, when Ms. Skolak arrived at CHP on October 21, 2014, within time frame that Defendant said they would be at the hospital, Defendant and Fair were not there. N.T. 136-139. Ms. Skolak was not able to meet with Defendant and Fair in-person and, thereafter, the case was transferred to WCCB assessment caseworker Brandy Trout (hereinafter "Ms. Trout"). N.T. 138-140.

Ms. Trout testified that she was assigned the case to conduct the investigation regarding the ChildLine referral on October 22, 2012 and that she made arrangements to go to E.P.'s home. N.T. 152. Ms. Trout, along with a couple state troopers, met with Defendant and Fair in their home in New Alexandria, Pennyslvania, on October 23, 2012.[16] N.T. 153-154. Ms. Trout testified that the home, which is a trailer, is located within walking distance to multiple residences, one of which is Defendant's father's residence. N.T. 153. While Ms. Trout was in the home, Defendant reported to her that on October 17, 2012, while Fair was sleeping in the bedroom, Defendant was sleeping in the living room with E.P. in the bassinet in the same room. N.T. 156. Around 3:00 or 4:00 a.m., Defendant awoke and E.P. was making a

---

[16] Both Defendant and Peterman voluntarily spoke with Ms. Trout and the troopers. N.T. 166.

8

whimpering noise, but not crying. N.T. 156. Defendant reported that he checked E.P.'s apnea monitor, but it was not going off. N.T. 156. After seeing that the bassinet was resting on its right side, with the left end still connected to the frame and the other side down, and that the two pins from the frame were bent, the position of which Defendant demonstrated for Ms. Trout, Defendant stated that he picked up E.P., who was fussing and whimpering, from the bassinet. N.T. 156-157. Defendant told Ms. Trout that E.P. calmed instantly as Defendant rubbed E.P.'s back and that E.P. looked fine with no marks. N.T. 157. Defendant reported that he then placed E.P. back in the bassinet carrier and moved it to the couch because that was where Defendant was sleeping for the night. N.T. 157.

While Defendant was in the living room assembling the bassinet and equipment for the troopers as they were photographing things, Ms. Trout and Tpr. Adamski spoke with Fair in the parents' bedroom. N.T. 157-158. Fair reported to Ms. Trout that Fair remembered waking up in bed in their bedroom on October 17, 2012, around 11:00 p.m., with Defendant next to her and E.P. in the bassinet on the wooden chair in front of the dresser. N.T. 158-159, 166. Fair stated that after she put a bottle in the microwave, Fair changed E.P.'s diaper and did not notice anything wrong with E.P. on October 17, 2012. N.T. 159.

Fair told Ms. Trout that, on October 18, 2012, around 7:30 p.m., when Fair was in the kitchen, E.P.'s apnea monitor went off. N.T. 159, 167, 178. Fair ran back, flipped on the lights and saw that E.P.'s lips were blue. N.T. 167. Fair put her hand on E.P.'s chest and after Fair's attempts to rock E.P. awake showed no results, Fair squeezed E.P.'s toes as Fair had been taught to do at the hospital. N.T. 167. After E.P. still did not respond and with her head hung back and lifeless, Fair took E.P.'s clothes and monitor off and performed CPR on E.P. N.T. 159, 167. E.P. then burped up some formula and, to Fair, E.P. seemed okay. N.T. 167. Fair told Ms. Trout that Defendant was not home on that day, and that, because Fair did not have a phone, Fair did not call Defendant. N.T. 159,169.

Fair reported that E.P. was fine on October 19th, but on October 20, 2012, around 2:00 or 3:00 p.m., after just being fed and while in the bassinet, E.P.'s alarm went off. N.T. 159. Fair stated that E.P. was unresponsive so Defendant put E.P. on the bed and performed CPR. N.T. 159. When Ms. Trout asked Fair when Fair realized that something was wrong with E.P., Fair told Ms. Trout that, while she was dressing E.P., Fair noticed that E.P.'s right leg was swollen, so after calling the pediatrician, they were told to take E.P. to the hospital. N.T. 159.

When Ms. Trout questioned Defendant and Fair regarding E.P. not being taken to the hospital on the 18th after Fair had performed CPR on E.P., Defendant and Fair told Ms. Trout that, together, they made the decision to not seek medical treatment for or to take E.P. to the hospital because E.P. had no noticeable

9

injuries. N.T. 160-161. When questioned regarding any additional caregivers other than Defendant and Fair, for E.P., Fair told Ms. Trout that although a paternal aunt was around E.P. while the parents did laundry with the paternal aunt, paternal aunt was never alone with E.P. N.T. 160.

Tpr. Adamski was the primary State Trooper investigating this case. N.T. 469. After receiving a call from WCCB caseworker Amie Skolak, Tpr. Adamski traveled to CHP to begin the investigation. N.T. 470. Tpr. Adamski spoke to all of the treating physicians, the WCCB caseworkers involved in the case, and Defendant and Fair. N.T. 470-477. The first time Defendant spoke to Tpr. Adamski was on October 21, 2012. N.T. 477. Defendant reported that he worked at his father's garage at the trailer park where Fair and Defendant's trailer was located. N.T. 476. During that interview, Defendant told Tpr. Adamski that, at the time of the October 17th incident, Defendant was sleeping on a couch in the living room with E.P. in her bassinet, while Fair slept in their bedroom. N.T. 477-478. When Defendant woke up because E.P. was fussing and he saw that the bassinet had fallen, Defendant woke Fair up and they both checked on her before they went back to bed. N.T. 478-479. Defendant reported that the following day, on October 18th, when he arrived home around 10:00 p.m., Fair was upset and reported to Defendant that the monitor went off and E.P. was not breathing. N.T. 480. Defendant reported that Fair told him that Fair gave E.P. CPR and E.P. became responsive again. N.T. 480. Defendant stated that the following day, on October 19th, E.P. was fine. N.T. 480. Defendant told Tpr. Adamski that, on October 20th, E.P.'s alarm went off around 1:30 p.m. to 2:00 p.m. and, during that incident, Defendant performed CPR on E.P. before they called the pediatrician and ultimately transported E.P. to Westmoreland Hospital. N.T. 481-482.

Tpr. Adamski testified that Defendant said that only Defendant and Fair took care of E.P. N.T. 486. After that, Tpr. Adamski interviewed Fair. N.T. 488. Fair stated that she was a stay-at-home mom. N.T. 488. Regarding the October 17th incident, Fair reported that she was sleeping in the bedroom and Defendant and E.P. were sleeping in the living room. N.T. 489. Fair stated that Defendant told her, in the morning, that the bassinet broke and fell over, that Defendant checked on E.P., and E.P. seemed fine. N.T. 489. Fair's report regarding October 18th, 19th, and 20th was essentially consistent with previous reports. N.T. 489-491. Fair told Tpr. Adamski that she did not mishandle E.P., even accidentally. N.T. 491. Fair also reported that she and Defendant were the only caregivers for E.P. N.T. 492. After Fair and Defendant provided conflicting stories regarding October 17th, Tpr. Adamski spoke to Defendant again and made him aware of the conflict; however, Defendant did not respond or correct Tpr. Adamski. N.T. 492-493.

Tpr. Adamski stated that Defendant and Fair's trailer measured approximately 52 by 14 feet wide, and that, the trailer was thinly insulated. N.T. 516. When Tpr. Adamski was present during the interview with

10

Defendant and Fair at the residence and the other state troopers were there, Tpr. Adamski did not have a problem hearing people in other parts of the trailer. N.T. 516.

PSP Corporal David Leonard (hereinafter "Cpl. Leonard") testified that he assisted Tpr. Adamski with suspect interviews related to this case. N.T. 416. Cpl. Leonard stated that he interviewed Fair on October 30, 2012 at the PSP Kiski barracks. N.T. 417. When he questioned Fair regarding whether she had done anything even accidentally to contribute to E.P.'s injuries, Fair stated that she did not. N.T. 418. Cpl. Leonard testified that there were numerous inconsistencies in Defendant's rendition of the events which could have caused E.P.'s injuries. N.T. 417-418. Importantly, when Cpl. Leonard asked Fair if there were any other incidents which could have caused E.P.'s injuries, Fair reported that there was a second bassinet collapse sometime between October 1st and 17th, but before October 17th. N.T. 423. Fair reported that the incident occurred while Fair was in the shower and Defendant was with E.P. N.T. 423. That was significant because it was the first time anyone reported a second bassinet collapse.

Cpl. Leonard testified that he also assisted Tpr. Adamski with interviewing Defendant on November 5, 2012 at PSP Kiski barracks. N.T. 423. When he asked Defendant regarding whether he had done anything even accidentally to contribute to E.P.'s injuries, Defendant stated that he did not. N.T. 424. When Defendant described the bassinet incident on the 17th, Defendant told Cpl. Leonard that, after the bassinet fell, E.P. was facing downward, lying on the oxygen tank. N.T. 425. Additionally, Defendant stated that he took E.P. into the parents' bedroom where Fair was sleeping, placed E.P. in the bassinet, and they went to sleep. N.T. 425. Cpl. Leonard noted that Defendant's description was inconsistent with prior statements that he had provided. Defendant also, for the first time, told Cpl. Leonard about a second bassinet collapse in which he claimed he caught the bassinet before it completely fell and E.P. did not fall from it, and about the parents having a black lab who gets excited when E.P.'s alarm goes off. N.T. 426-427.

Dr. Dwayne Shuhart, a physician at Children's Community Pediatrics in Blairsville, Pennsylvania, testified as an expert in pediatrics. N.T. 317-320. Dr. Shuhart examined E.P. on several occasions for check-ups at the Blairsville office. N.T. 322. Defendant and Fair took E.P. to her first visit with Dr. Shuhart on September 25, 2012. N.T. 322-323. At that visit, Dr. Shuhart conducted a head-to-toe assessment of E.P., which included feeling the belly, listening to the lungs, manipulation of the hips by bending the legs out and back a couple times and touching the head to check the fontanel and anterior fontanel. N.T. 324-325. Other than being a normal, newborn pre-term baby who had some bradycardia, Dr. Shuhart testified that E.P. was within normal limits and the assessment was unremarkable. N.T. 326.

11

Defendant and Fair took E.P. to her second visit, a scheduled follow-up, with Dr. Shuhart on October 9, 2012. N.T. 326-327. Dr. Shuhart testified that he conducted the same head-to-toe assessment of E.P. which required manipulation of E.P.'s body in the same manner as the first visit. N.T. 328. Again, the assessment resulted in E.P. being within normal limits. N.T. 328. Dr. Shuhart testified that, based upon what occurs during the examinations, and how E.P. appeared during the exams on September 25th and October 9th, Dr. Shuhart opined that it was not likely that E.P. had over twenty (20) rib fractures, a flail chest, a skull fracture, or a femur fracture when he examined her on either date. N.T. 331-332. Dr. Shuhart explained that the fractured ribs would be quite painful and, based upon the movements conducted during the examination, he would expect the baby to be crying, fussing, and uncomfortable. N.T. 331. Also, based upon the manipulation that is done during the head and leg examination, the doctor opined that he would have picked up on any fractures. N.T. 332. Dr. Shuhart did not see, or note in the report, any swelling or bruising at all during either visit. N.T. 333.

On Saturday, October 20, 2012, Defendant called the office at 2:44 p.m., but because the call occurred on the weekend, the call was handled by an answering service. N.T. 329. Dr. Shuhart testified that the information received from the call was something about the leg and that the apnea monitor went off twice, once two to three days ago and then again a few minutes ago for low heart rate and not breathing. N.T. 329-330. Additionally, it was reported that, after checking, mom did CPR both times, E.P. vomited a large amount and then started to breathe, with slight stynosis of lips. N.T. 330. Dr. Shuhart stated that the triage person recommended that E.P. go immediately to the emergency room and, although an ambulance was offered, the family said they had an ETA of fifteen (15) to twenty (20) minutes to the hospital so they would drive the baby there. N.T. 330.

Thomas Stivason, E.P.'s foster father, testified regarding E.P.'s continuing problems. N.T. 456. Mr. Stivason and his wife, Robin, have had custody of E.P. since she was discharged from CHP on October 31, 2012. N.T. 456. Although E.P. has had no further fractures since being in their custody, Mr. Stivason testified that E.P. is doing good, but continues to have trouble with walking/running and that she falls often. N.T. 457. Although E.P. is two years old, she can't really run and she catches colds quite often, which results in the colds going straight to bronchitis. N.T. 458.

Meagan White, Fair's cousin, testified that Fair's reputation in the community is for being an honest, peaceful, non-violent, and very well liked person. N.T. 587-588.

Sue London, who has known Fair for Fair's entire life, testified that Fair is an honest, peaceful, non-violent person, and very well respected in the community. N.T. 589-591.

12

Fair testified on her own behalf. N.T. 607. Fair, who is twenty-three (23) years old, testified that she first met Defendant in October of 2011, that they started residing together sometime thereafter, and that, she became pregnant with E.P. in December of 2011. Fair testified regarding E.P.'s developmental history, about what the parents had learned while E.P. was at The Children's Home, and about how Fair felt E.P. was a normal baby. N.T. 610-612. Fair stated that she would never intentionally hurt E.P. N.T. 615. Fair then testified regarding the incidents on October 17th through October 20th and, when asked whether E.P. showed any signs of injuries or bruising, Fair stated that E.P. did not. N.T. 615-617. Fair stated that, after the incident on October 18th, she did not call 911 because she did not have a cell phone or landline telephone. N.T. 617-618.

Fair recounted what occurred on October 20th and stated that, once Defendant and Fair were with E.P. at Westmoreland Hospital, Fair stayed out of hospital staff's way and that she was in shock. N.T. 622-623. Throughout her testimony, Fair stated that she never saw any bruising or injuries on E.P. N.T. 626. Fair admitted that she recalled telling Cpl. Leonard about a second bassinet collapse that occurred prior to the one Defendant and Fair reported, but Fair could not recall whether she told Dr. Berger about the second bassinet collapse or if there was a reason that Fair didn't tell Tpr. Adamski about it. N.T. 637-638.

Fair testified that she would never intentionally, knowingly, or recklessly injure E.P, nor did she conspire with Defendant or have some agreement or plan with Defendant to injure E.P. N.T. 640. Fair denied that she aided or facilitated Defendant in injuring E.P. and Fair denied that she knowingly endangered E.P. N.T. 640. Lastly, Fair stated that she never committed any crimes on E.P. N.T. 641.

On cross-examination, Fair admitted that, while at The Children's Home, Defendant and Fair received training related to providing care to meet E.P.'s medical needs. N.T. 649-654. Fair signed a document which indicated that Fair should call the doctor if there's respiratory distress and that Fair should call a doctor when the baby is acting very sick. N.T. 648. Fair further admitted that, when E.P. was not breathing on October 18th, E.P. was very sick and not responding. N.T. 649. Fair testified that, when Fair was awake, she would be able to hear E.P. cry from any room in the family's trailer. N.T. 654. Fair admitted that, after the October 17th bassinet incident, Fair handled E.P. numerous times, and that, said handling would require Fair to manipulate E.P.'s body to change her diaper and sleepers and to feed and burp E.P. N.T. 662-665. Fair testified that she knew the incident on October 18th was very serious, but although there were around eleven other trailers in their trailer park and Fair was near a busy road, Fair did not carry E.P. anywhere to seek help for E.P. N.T. 666-672. Instead, Fair waited an hour and a half until Defendant came home and, even then, the two consulted and decided not to seek medical assistance.

N.T. 667. Fair stated that although she handled E.P. numerous times and in multiple ways between October 18th and October 20th, Fair did not think E.P. was hurt in any way. N.T. 672-673.

When questioned regarding the forty-four (44) minutes between when E.P.'s monitor went off on October 20th and when Defendant called the pediatrician's office, Fair stated that, other than Defendant performing CPR, she could not remember why it took so long. N.T. 676. When questioned why it took one (1) hour and ten (10) minutes from the time Defendant spoke to the pediatrician's office to Defendant and Fair arriving at Westmoreland Hospital, Fair stated that they had to get the diaper bag together, the bottles made, extra clothes, and putting E.P. in her car seat. N.T. 678. When questioned regarding E.P.'s caregivers, Fair maintained that Defendant and Fair were the only caregivers and that they provided said care together. N.T. 681.

## STIPLUATIONS

The parties stipulated that Dr. Gretchen Krimmel, a physician employed by West Penn Hospital, would testify that she treated E.P. when, after E.P.'s birth at Westmoreland Hospital and due to issues related to E.P.'s prematurity, E.P. was transferred to West Penn Hospital on July 20, 2012. N.T. 441-442. During E.P.'s hospitalization and ultrasound, E.P.'s head was normal with no bleeding and fractures, E.P. also had multiple normal chest x-rays and no evidence of fractures or bone problems were seen while E.P. was treated at West Penn, and E.P. physically developed well during her stay. N.T. 442. On September 12, 2012, the date of E.P.'s discharge from West Penn and transfer to The Children's Home, Dr. Krimmel conducted a full body head-to-toe examination of E.P. and E.P. was normal and had no injuries. N.T. 442-443. E.P. was discharged to The Children's Home with supplemental oxygen administered by nasal cannula. N.T. 443. Dr. Krimmel's discharge planning noted that E.P. would need to be discharged home on oxygen by nasal cannula, an A&B monitor, and that E.P.'s family required a monitor, a supplemental oxygen monitor, and CPR training prior to E.P. going home. N.T. 443.

The parties also stipulated that Erin Colvin, the Clinical Director of The Children's Home, would testify that E.P. was a patient at The Children's Home from September 12, 2012 through September 24, 2012. N.T. 444. E.P. was transferred there for further treatment of her prematurity and to prepare her and her parents for eventual discharge home, and that, head-to-toe assessments of E.P. were all normal. N.T. 444. The medical records indicate that, prior to E.P.'s discharge home on September 24, 2012, E.P. was given a full head-to-toe assessment, and that, her exam was normal with no fractures and she was developing well. N.T. 447.

14

# DISCUSSION

## I. Motion for Acquittal as to Aggravated Assault

Defendant argues that the Commonwealth failed to present sufficient evidence for the jury to find Defendant guilty of Aggravated Assault. Defendant specifically alleges that the verdicts in this case and his co-defendant's case (Com. v. Elizabeth Mae Fair, 587 C 2013) were inconsistent.

In Commonwealth v. Brown, the Pennsylvania Superior Court stated:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Com. v. Brown, 23 A.3d 544, 559-560 (Pa. Super. 2011) (*en banc*) citing Commonwealth v. Hutchinson, 947 A.2d 800, 805–06 (Pa. Super. 2008), appeal denied, 602 Pa. 663, 980 A.2d 606 (2009). As charged in this case, a person is guilty of aggravated assault if he or she attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. 18 Pa.C.S.A. 2702(a)(1). Serious bodily injury is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S.A. § 2602. A person acts intentionally with respect to serious bodily injury when it is his or her conscious object or purpose to cause such injury. 18 Pa.C.S.A. § 302(b)(1). A person acts knowingly with respect to serious bodily injury when he or she is aware that it is practically certain that his or her conduct will cause such a result. 18 Pa.C.S.A. § 302(b)(2). A person acts recklessly with respect to serious bodily injury when he or she acts with malice. Malice exists where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind

15

regardless of social duty, although a particular person may not be intended to be injured. Where malice is based on reckless disregard of consequences, it is not sufficient to show mere recklessness, it must be shown that the defendant consciously disregarded unjustified and extremely high risk that his and/or her actions might cause death or serious bodily injury. 18 Pa.C.S.A. § 302(b)(3); Pa. SSJI (Crim) § 15.2702B.

Although Defendant argues that the jury's verdict at Count 1 makes no sense based upon the evidence presented at trial, this Court is not persuaded. This Court finds that there was sufficient evidence for the jury to determine that Defendant committed Aggravated Assault upon E.P. Both Defendant and Fair always maintained that they were E.P.'s only caretakers. Viewing the evidence in the light most favorable to the Commonwealth, E.P. was a healthy and fracture-free infant when she left The Children's Home and was placed exclusively in Defendant and Fair's care. There was no family medical history that would account for E.P.'s near-fatal injuries and, E.P. did not suffer from any genetic disease which would account for the severe injuries. Fair testified that both parents received training at The Children's Home regarding E.P.'s medical needs, how to perform CPR should it be necessary, and on how to operate the medical apparatus that E.P. would necessitate upon discharged.

Additionally, although Defendant and Fair consistently denied accidentally or intentionally injuring E.P., Dr. Berger testified that, based upon her experience in handling over a thousand child abuse cases, and upon her examination of all the records and her physical assessment of E.P., E.P.'s injuries were the result of child abuse that occurred on more than one occasion and that the injuries were extremely painful and life threatening. Dr. Berger explained that E.P.'s multiple rib fractures could not have been the result of the CPR that was performed on E.P. Dr. Berger also opined that the history of the fall from the bassinet could have accounted for one of the injuries, but that it did not account for all of the injuries, and that E.P. was in significant pain at the time the fractures occurred. As Dr. Berger explained, it would not have been possible for Defendant and Fair to be unaware that E.P.'s forearms and femur were fractured or that E.P. was in a tremendous amount of pain.

The Commonwealth was not required to present an eyewitness to the abuse or a confession from the abuser, nor was it required of Dr. Berger to identify whether the abuse was perpetrated by a male or female. The Commonwealth did prove that the only caretakers for E.P. were Defendant and Fair, that Defendant and Fair were communicating on multiple occasions regarding whether to take E.P. to seek additional medical treatment, and that E.P. suffered near-fatal injuries of varying ages, that were,

16

according to Dr. Berger, a result of child abuse. Clearly, from the jury's verdict, the jury believed that the Commonwealth met its burden and that Defendant inflicted injuries upon E.P. which constituted serious bodily injury.

Finally, the evidence as to each defendant was not identical. The jury was free to consider the fact that Defendant's explanation as to how the injuries may have occurred, and the circumstances surrounding the events, changed over time. In addition, the jury could have considered Defendant's admission to the police that he had lied to make himself look better.

Based upon the evidence presented, this Court finds no error in the jury's verdict or in the sufficiency of evidence upon which the jury's verdict is based.

## II. Motion for Acquittal as to Conspiracy to Commit Aggravated Assault

Defendant challenges the sufficiency of the evidence to prove Defendant committed the crime of Criminal Conspiracy to Commit Aggravated Assault. Defendant does not challenge the sufficiency of the evidence to prove that Defendant committed the crime of Criminal Conspiracy to Commit Endangering the Welfare of Children. Defendant again alleges that the verdict in this case was inconsistent. He points out that Fair never implicated Defendant in her interviews and that Dr. Berger could not state whether a male or a female inflicted the injuries on E.P. N.T. 300.

In pertinent part, the Commonwealth charged that Defendant, with the intent of promoting or facilitating the crime of Aggravated Assault against E.P., conspired and agreed with Fair, that they or one or more of them would engage in conduct constituting such crime, and in furtherance thereof, one or more of them did commit the overt act of inflicting trauma upon E.P. In Pennsylvania, a person is guilty of conspiracy with another person to commit a crime if with the intent of promoting or facilitating its commission he or she agrees with such other person or that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime. 18 Pa.C.S.A. § 903(a)(1). Aggravated Assault was defined in the above-discussed issue.

Defendant argues that there was no evidence, direct or circumstantial, that Defendant conspired with Fair to commit the crime of Aggravated Assault on E.P., that there was no evidence to prove an agreement to commit Aggravated Assault, and that there was no evidence to prove an overt act committed by either parent in furtherance of the conspiracy. Defendant argues that the evidence as to each defendant was identical other than the fact that the co-defendant, Fair, testified and Defendant did not.

17

In Commonwealth v. Johnson, the Pennsylvania Superior Court explained:

> To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy.
>
> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Commonwealth v. Keefer, 487 A.2d 915, 918 (Pa. Super. 1985). Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. Commonwealth v. Sattazahn, 631 A.2d 597, 602 (Pa. Super. 1993) appeal denied, 652 A.2d 293 (Pa. 1994).
>
> An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Commonwealth v. Kennedy, 499 Pa. 389, 395, 453 A.2d 927, 929–930 (Pa. 1982). Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. Commonwealth v. Woodward, 614 A.2d 239, 243 (Pa. Super. 1992).
>
> The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt. Commonwealth v. McKeever, 689 A.2d 272, 274 (Pa. Super. 1997). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. Commonwealth v. Soto, 693 A.2d 226, 229–230 (Pa. Super. 1997), appeal denied, 705 A.2d 1308 (Pa. 1997).

Commonwealth v. Johnson, 719 A.2d 778, 784–85 (Pa. Super. 1998) (*en banc*). The standard for sufficiency of the evidence was explained in the first issue.

Although Defendant argues to the contrary, this Court finds that there was sufficient evidence that Defendant entered into an agreement with Fair to commit Aggravated Assault on E.P., and that, one or both of them, committed the overt act of inflicting forcible trauma upon E.P. Both Defendant and Fair always maintained that they were E.P.'s only caretakers. Viewing the evidence in the light most favorable to the Commonwealth, E.P. was a healthy and fracture-free infant when she left The Children's Home and was placed exclusively in Defendant and Fair's care. There was no family medical history that would account for E.P.'s near-fatal injuries and, E.P. did not suffer from any genetic disease which would account for the severe injuries. Fair testified that both parents received training at The Children's Home regarding E.P.'s medical needs, how to perform CPR should it be necessary, and on how to operate the medical apparatus that E.P. would necessitate upon discharge.

18

Defendant and Fair both stated that they were aware that E.P. was having multiple "medical episodes," during which, neither parent was able to stimulate E.P. back to consciousness without performing CPR, from October 17th through October 20th. Defendant and Fair each told the other about every medical episode that occurred, but together, they decided not to seek medical care for their infant daughter.

Additionally, although Defendant and Fair consistently denied accidentally or intentionally injuring E.P., Dr. Berger testified that, based upon her experience in handling over a thousand child abuse cases, and upon her examination of all the records and her physical assessment of E.P., E.P.'s injuries were the result of child abuse that occurred on more than one occasion and that the injuries were extremely painful and life threatening. Dr. Berger explained that E.P.'s multiple rib fractures could not have been the result of the CPR that was performed on E.P. Dr. Berger also opined that the history of the fall from the bassinet could have accounted for one of the injuries, but that it did not account for all of the injuries, and that, E.P. was in significant pain at the time the fractures occurred. As Dr. Berger explained, it would not have been possible for Defendant and Fair to be unaware that E.P.'s forearms and femur were fractured or that E.P. was in a tremendous amount of pain.

The Commonwealth was not required to prove a spoken agreement between Defendant and Fair for purposes of a conspiracy, but the Commonwealth did prove that the only caretakers for E.P. were Defendant and Fair, that Defendant and Fair were communicating on multiple occasions regarding whether to take E.P. to seek additional medical treatment, and that E.P. suffered near-fatal injuries of varying ages, that were, according to Dr. Berger, a result of child abuse. Further, in her closing argument, the Assistant District Attorney offered overt agreements between the defendants as well as the circumstantial evidence of the conspiracy. The evidence presented and all reasonable inferences arising from the evidence were sufficient to prove guilt beyond a reasonable doubt. Commonwealth v. Madison, 462 A.2d 228 (Pa. 1983). Clearly, from the jury's verdict, the jury believed that the Commonwealth met its burden and that Defendant conspired with Fair to commit the Aggravated Assault.

Finally, there was brief testimony from Dr. Berger regarding general statistics of child abuse. The jurors were free to give whatever weight to that testimony as they felt it warranted. Based upon the evidence presented, this Court finds no error in the jury's verdict or in the sufficiency of evidence upon which the jury's verdict is based.

Defendant also argues that this Court's charge regarding Count 2: Criminal Conspiracy was misleading. This Court is not persuaded by Defendant's argument. This Court did read the standard

19

jury instruction regarding criminal conspiracy and, in addition, this Court explained the Jury Verdict Form. N.T. 836. This Court instructed the jury as follows:

> So, let me explain the verdict slips.[] Count 2, guilty or not guilty. And then you'll see under Count 2, which is the criminal conspiracy, that you need to make a finding as to guilty as to which crime, if any, was the object of the conspiracy. So, you'll see aggravated assault, conspiracy, guilty or not guilty. Endangering welfare of children, conspiracy, guilty or not guilty. So, you find guilty or not guilty as to conspiracy and then tell me which if any of the crimes were the object of the conspiracy.

N.T. 836-837. This Court finds that it did properly instruct the jury with respect to Count 2: Criminal Conspiracy. Further, a defendant fails to preserve a claim for appellate review that the trial court erred in it charge where the defendant did not declare that he lodged specific objections or exceptions to the instruction that was given. Commonwealth v. Baker, 963 A.2d 495 (Pa. Super. 2008). Here, Defendant did not object to this Court's instruction prior to or, at the time it was read, although said instruction was offered to both parties prior to the instruction being read during the jury charge. In fact, Counsel for all parties involved agreed that the jury instructions and verdict slip were appropriate. N.T. 740-743. Therefore, this Court finds no merit to this issue.

## III. Motion in Arrest of Judgment

Although Defendant raises this issue independently, the substance of said issue is contained within the first two issues that Defendant raises. Therefore, the reasons for this Court's denial of this issue is contained within the above-two issues.

## IV. Motion for New Trial: Weight of the Evidence

Defendant alleges that the verdicts were against the weight of the evidence. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Commonwealth v. Widmer, 744 A.2d 745 (Pa. 2000). Thus, the Commonwealth argues that the defendants cannot logically pursue both of these arguments on appeal. (Com.'s Br. p. 6). Furthermore, a motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Commonwealth v. Cousar, 928 A.2d 1025, 1035-1036 (Pa. 2007). An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. Id. at 1036. The fact finder is free to believe all, part, or none of the evidence and to determine the credibility of the

20

witnesses. Id. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. Id. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Id. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. Id. See Commonwealth v. Keaton, 729 A.2d 529, 540–541 (Pa. 1999).

In the case *sub judice*, Defendant again argues that the weight of the evidence supports Defendant's argument that there was no conspiracy or agreement to commit Aggravated Assault upon E.P. While this Court understands Defendant's argument, this Court is not persuaded by it. The jury heard testimony that Defendant and Fair denied intentionally or accidentally injuring E.P., agreeing with Fair to do the same, or knowing that E.P. was injured, but failing to seek medical treatment for her. The jury also heard testimony that E.P. was a healthy fracture-free infant when E.P. was discharged home to Defendant and Fair, that Defendant and Fair were the only caregivers for E.P., that E.P. sustained numerous severe, painful, and life threatening injuries, and that those injuries were caused by child abuse. The jury's verdict is not against the weight of the evidence presented. Clearly, the jury determined that Defendant did commit the Aggravated Assault, and that, Defendant conspired with Fair to commit the Aggravated Assault. The jury was certainly capable of determining whether to believe all, part, or none of the evidence with respect to whether the Commonwealth met its burden at each count and to determine the credibility of each witness. Based upon this Court's review of the entire record, this Court does not find that the jury's verdict is so contrary to the evidence as to shock this Courts' sense of justice. Therefore, this Court does not find that the jury's verdict was against the weight of the evidence.

For the reasons set forth above, the Court enters the Order of Court attached hereto.

21

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
 )
 vs. ) NO. 600 C 2013
 )
CHRISTOPHER LAWRENCE PETERMAN )

## ORDER OF COURT

AND NOW, to wit, this 17th day of August, 2015, for the reasons set forth in the foregoing Opinion, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1. Defendant's Post-Sentence Motion for Acquittal as to Aggravated Assault is DENIED.

2. Defendant's Post-Sentence Motion to Acquittal as to Conspiracy to Commit Aggravated Assault is DENIED.

3. Defendant's Post-Sentence Motion in Arrest of Judgment is DENIED.

4. Defendant's Post-Sentence Motion for New Trial: Weight of the Evidence is DENIED.

BY THE COURT:

_____
Meagan Bilik-DeFazio, Judge

cc: Judith Petrush, Esq., Assistant District Attorney
 Gregory L. Cecchetti, Esq., for Defendant
 District Court Administrator

22